AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Missouri

| | |
|---|---|
| In the Matter of the Search of<br><br>INFORMATION ASSOCIATED WITH JOANNA@LANDEDADVENTURES.COM (DSID 123194879) THAT IS STORED AT PREMISES CONTROLLED BY APPLE INC. | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No: **4:25 MJ 2302 JSD**

**FILED UNDER SEAL**

SIGNED AND SUBMITTED TO THE COURT FOR FILING BY RELIABLE ELECTRONIC MEANS

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property

### SEE ATTACHMENT A

located in the _____NORTHERN_____ District of _____CALIFORNIA_____ , there is now concealed

### SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

**I state under the penalty of perjury that the following is true and correct.**

_____
*Applicant's signature*

Craig M. Schneider, Special Agent, FBI
*Printed name and title*

**Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.**

Date: _____09/12/2025_____

_____
*Judge's signature*

City and state: __St. Louis, MO__

Honorable Joseph S. Dueker, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH **JOANNA@LANDEDADVENTURES.COM (DSID 123194879)** THAT IS STORED AT PREMISES CONTROLLED BY APPLE INC. | Case No.  4:25 MJ 2302 JSD **FILED UNDER SEAL** SIGNED AND SUBMITTED TO THE COURT FOR FILING BY RELIABLE ELECTRONIC MEANS |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Craig Schneider, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), as well as Federal Rule of Criminal Procedure 41, to require Apple Inc. ("Apple"), an electronic communications service/remote computing service provider, to disclose to the United States records and other information, including the contents of communications, associated with the above-listed Apple IDs that is stored at premises owned, maintained, controlled, or operated by Apple, which is headquartered at 1 Apple Park Way, Cupertino, California.  The information to be disclosed by Apple and searched by the United States is described in the following paragraphs and in Attachments A and B.

2.      I have been a Special Agent with the Federal Bureau of Investigation since March 2018 and am currently assigned to the FBI's St. Louis Field Office.  During my tenure as a Special Agent with the FBI, I have conducted numerous financial fraud investigations, including, but not limited to, investigations involving violations of 18 U.S.C. § 1343 (wire fraud).  I have also received training and gained experience regarding the use of cellular telephones during and in furtherance of criminal activity, and in searching email and other electronic accounts, including

Apple ID accounts, to ascertain evidence of criminal conduct that may be present on such accounts.

3.      The facts included in this affidavit come from my personal knowledge and observations, my training and experience, my collection of statements and information from witnesses and other law enforcement officers, and my review of records, documents, and other evidence obtained during this investigation.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts included in this affidavit, there is probable cause to believe that violations of federal law, including, but not limited to, violations of 18 U.S.C. § 1343 (wire fraud), have been committed by Thomas Markwell ("**Markwell**"), Joanna Dettmann a/k/a Joanna St. Gemme ("**Dettmann**"), Nathan Boyd ("**Boyd**"), Brian Zukowski ("**Zukowski**"), and Juan Acevedo Miloslavich ("**Miloslavich**") (collectively, the "**Targets**"), as well as other persons known and unknown.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes, as further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## LOCATION TO BE SEARCHED

6.      The location to be searched is:

**TOM_MARKWELL@YAHOO.COM (DSID 401336549)** ("**Subject Account #1**"),

2

**TMARKWELL@NCLCORP.COM (DSID 16731219964)** ("**Subject Account #2**"),

**JOANNA@LANDEDADVENTURES.COM (DSID 123194879)** ("**Subject Account #3**), and

**BOYDNATEBOYD@GMAIL.COM (DSID 10818899805)** ("**Subject Account #4**"),

(collectively, the "**Subject Accounts**").  The **Subject Accounts** are located at premises owned, maintained, controlled, or operated by Apple, which is headquartered at 1 Apple Park Way, Cupertino, CA 95014.

## BACKGROUND INFORMATION RELATING TO APPLE ID AND iCLOUD[1]

7.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

8.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

a.     Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.     iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to

---

[1] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

conduct video calls.

c. iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services and can be used to store iOS device backups and data associated with third-party apps.

d. iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f. Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's

4

approximate location.

h.      App Store and iTunes Store are used to purchase and download digital content.  iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS.  Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

9.      Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services.  A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

10.      An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address.  Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

11.      Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated

5

with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

12. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

13. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access

6

services through icloud.com and apple.com.  Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

14.    Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data.  Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive.  Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

15.    In some cases, account users will communicate directly with Apple about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users.  Apple typically retains records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

**PROBABLE CAUSE**

16.     The investigative team is investigating the **Targets** for their suspected involvement in a fraudulent invoice scheme through which Norwegian Cruise Line was defrauded of more than $2 million.   Based on evidence obtained throughout the course of this investigation, the investigative team believes that the scheme began as early as in or around June 2021 and continued until as late as in or around September 2023.

A.      **Background Regarding the Targets**

1.      *Markwell*

17.     At certain times, including at times relevant to this investigation, **Markwell** was employed by Norwegian Cruise Line, with his last job title being Senior Director of Events.

18.     As the Senior Director of Events, **Markwell** was entrusted with unilateral authority to approve outside vendors to be established in Norwegian Cruise Line's payment system and to approve the payment of individual invoices—up to $150,000 per invoice—issued to Norwegian Cruise Line by its vendors.

2.      *Boyd and Dettmann*

19.     One of Norwegian Cruise Line's outside vendors with which **Markwell** worked was Esquina, LLC d/b/a Global Evento ("Global Evento"), a corporate gifting service company headquartered in St. Louis, Missouri, within the Eastern District of Missouri, which assists corporate clients with procuring gifts for the clients' employees, customers, and business partners.

20.     At certain times, including at times relevant to this investigation, **Boyd** was a co-owner of Global Evento.

21.     At certain times, including at times relevant to this investigation, **Boyd's** romantic partner, **Dettmann**, worked for Global Evento on an independent contractor basis, initially in her

individual capacity and then later through her business, GEM Consulting LLC ("GEM"), which is headquartered in St. Louis, Missouri, within the Eastern District of Missouri.

22.     When Global Evento provided services to Norwegian Cruise Line, **Markwell's** primary points of contact were **Boyd** and **Dettmann**.

### 3.     *Zukowski and Miloslavich*

23.     At certain times, including at times relevant to this investigation, **Zukowski** and **Miloslavich** both had a romantic relationship with **Markwell**, and the three of them lived together at 624 NE 29th Dr., Apt. A, Wilton Manors, Florida 33334.

### B.     The Scheme to Defraud Norwegian Cruise Line

24.     During this investigation, the investigative team has identified several methods that the **Targets** are suspected of having used to carry out their scheme to defraud Norwegian Cruise Line. Those methods are described below, along with a supporting example for each.

### 1.     *Global Evento's Marked-Up Invoices to Norwegian Cruise Line*

25.     The investigative team's investigation has revealed numerous instances in which either **Boyd** or **Dettmann** (or both) caused Global Evento to issue to Norwegian Cruise Line fraudulent invoices that were marked up to reflect an amount that exceeded the costs and fees legitimately owed by Norwegian Cruise Line.

26.     After Norwegian Cruise Line paid those invoices because of **Markwell's** approval, **Boyd** or **Dettmann** (or both) caused Global Evento to pay a portion of the markup to **Markwell's** romantic partner, **Zukowski**.

27.     For example, on or about December 7, 2022, **Markwell** sent an email to **Boyd** and **Dettmann**, in which **Markwell** wrote, among other things, that:

        a.      **Markwell** had identified a vendor that could provide bags for Norwegian

Cruise Line at a "final cost" of "$42 (all-in)."

b.   **Markwell** wrote that "I would want to order this through you [*i.e.*, Global Evento] (2,750 units) at $60 (splitting $9 each)."

c.   **Markwell** requested that **Boyd** and **Dettmann** send him "three invoices: $73,333 each" (which **Markwell** had unilateral authority to approve because none exceeded his $150,000 approval threshold).

28.   That same day (on or about December 7, 2022), **Boyd** (with **Dettmann** cc'd) emailed Global Evento's office manager, instructing her to prepare three invoices of $73,333 each that needed "to be sent to Tom [*i.e.*, **Markwell**] today."

29.   The office manager later sent those invoices to **Boyd** and **Dettmann**, and then **Dettmann** (with **Boyd** cc'd) emailed them to **Markwell.**

30.   Thereafter, on or about December 12, 2022, **Markwell** emailed **Boyd**, writing that the "three Global Evento invoices will transmit on Wednesday," and informing **Boyd** that "I am sending Brian's [*i.e.*, **Zukowksi's**] invoice to you now for the $9 per unit mark-up for our side that was mentioned below."

31.   On or about December 21, 2022, **Markwell** emailed **Boyd** an invoice in the amount of $24,750 (2,750 x $9) from "Brian **Zukowski** d/b/a Zukowski Productions Services" for a "date of service" of "04/22 – 04/29/2023" (dates that were four months in the future).

32.   The next day, on or about December 22, 2022, **Boyd** forwarded the **Zukowski** invoice to **Dettmann**. **Boyd** (with **Dettmann** cc'd) then emailed the **Zukowski** invoice to Global Evento's office manager, confirming that Global Evento had "been paid the $73k x 3 last week," and claiming that **Zukowski** "is the normal person that helps us with the kitting when it is a Macher project.  Thanks and let me know when you have this sent so I can give them a heads up."

10

33. According to Global Evento, **Zukowski** did not provide any services for or on behalf of it, and, to this point, the investigative team's investigation has not uncovered any evidence suggesting otherwise.

34. That same day (on or about December 22, 2022), **Boyd** (with **Dettmann** cc'd) emailed **Markwell** confirmation that Global Evento had wired the invoice payment to **Zukowski**, to which **Markwell** responded, "Great, my Amex is due that day – they'll greatly appreciate this, LOL!"

35. As part of this investigation, the investigative team obtained, among other records, records for **Zukowski's** J.P Morgan Chase Bank account. Those records reflect that, between in or around May 2022 and in or around February 2023, **Zukowski** received more than $180,000 in payments from Global Evento.

### 2. *Global Evento's Fraudulent Invoices to Norwegian Cruise Line That Included Charges for the Target's Personal Expenses*

36. The investigative team's investigation has also revealed numerous instances in which either **Boyd** or **Dettmann** (or both) caused Global Evento to issue to Norwegian Cruise Line fraudulent invoices for the **Target's** personal expenses that were unrelated to any corporate gifting services provided by Global Evento to Norwegian Cruise Line, which invoices Norwegian Cruise Line paid because of **Markwell's** approval.

37. For example, on or about May 26, 2023, **Markwell** emailed **Dettmann**, requesting that she book an Airbnb stay at a house in Wilton Manors, Florida (*i.e.*, the same town where **Markwell**, **Zukowski**, and **Miloslavich** lived) from May 29, 2023 to June 29, 2023 for "3 Adults, 2 Pets (LOL)."

38. **Dettmann** then responded "what would you like the invoice to read," and **Markwell** replied "Fat Homeless Bitch and her cat . . . . . . Seven Seas Grandeur Travel."

39. When **Dettmann** booked the Airbnb for **Markwell** at a cost of $15,504.89, she charged it to her Global Evento credit card.

40. Four days later, on or about May 30, 2023, **Dettmann** requested that the Airbnb charge on her Global Evento credit card be invoiced by Global Evento to Norwegian Cruise Line at a cost of $16,000 under "Seven Seas Grandeur Travel."

41. Two days after that, on or about June 1, 2023, **Dettmann** emailed **Markwell** that invoice, which she referred to as the "Grandeur Travel invoice."

42. Thereafter, on or about June 12, 2023, **Markwell** emailed **Dettmann**, asking her to book another Airbnb in Wilton Manors, Florida from June 28, 2023 to July 31, 2023.  In that email, **Markwell** wrote, "We'd stay here. But the mattresses are so bad I can't sleep. And the dryer burns up clothes."

43. Dettmann once again booked the Airbnb for **Markwell**, this time at a cost of $16,598.49, using her Global Evento credit card.

44. On or about July 5, 2023, **Dettmann** forwarded the receipt for the second Airbnb to Global Evento's office manager and provided an expense code associated with Norwegian Cruise Line.

45. Records provided to the investigative team by Global Evento reflect that **Dettmann** also caused this second Airbnb charge to be included as part of an invoice issued by Global Evento to Norwegian Cruise Line.

46. According to Global Evento, none of those Airbnb costs were related to corporate gifting services that Global Evento provided to Norwegian Cruise Line, and, to this point, the investigative team's investigation has not uncovered any evidence suggesting otherwise.

47. Information and records obtained by the investigative team from, among other

sources, Global Evento and Norwegian Cruise Line, indicate that, between in or around June 2021 and in or around September 2023, **Boyd** or **Dettmann** (or both) caused Global Evento to invoice Norwegian Cruise Line for over $1 million of the **Targets'** unauthorized personal expenditures, including for designer merchandise from Louis Vuitton, Balmain, Givenchy, Burberry, Fendi, and Cartier and for international trips to Italy, Turkey, and Mexico.

### 3. *Dettmann and Miloslavich's Fraudulent Invoices to Norwegian Cruise Line*

48.     The investigative team's investigation has further revealed numerous occasions on which Norwegian Cruise Line paid fraudulent invoices from GEM (**Dettmann's** consulting business) and **Miloslavich** (d/b/a "Juan A. Acevedo Miloslavich Event Productions") because of **Markwell's** approval of those invoices.

49.     According to Norwegian Cruise Line, neither **Dettmann** nor her business provided any services for or on behalf of Norwegian Cruise Line outside of the work performed through Global Evento, which was invoiced by Global Evento to Norwegian Cruise Line, and, to this point, the investigative team's investigation has not uncovered any evidence suggesting otherwise.

50.     Likewise, according to Norwegian Cruise Line, **Miloslavich's** invoices do not align with the limited work that he may have performed for or on behalf of Norwegian Cruise Line, and, to this point, the investigative team's investigation has not uncovered any evidence suggesting otherwise.

51.     As part of this investigation, the investigative team obtained, among other records, records for GEM's (*i.e.*, **Dettmann's**) Commerce Bank account. Those records reflect that, between in or around November 2022 and in or around September 2023, GEM (*i.e.*, **Dettmann**) received more than $100,000 in payments from Norwegian Cruise Line.

52.     As part of this investigation, the investigative team obtained, among other records,

13

records for **Miloslavich's** Bank of America account. Those records reflect that, between in or around November 2022 and in or around September 2023, **Miloslavich** received more than $550,000 in payments from Norwegian Cruise Line.

### C. The Subject Accounts

53. As part of this investigation, the investigative team obtained a federal search warrant for **Boyd** and **Dettmann's** Global Evento email accounts.

54. The contents of those email accounts reflected, among other things, that, in addition to communicating via email, **Boyd** also communicated with **Markwell** and **Dettmann** through text messages using iPhones.

55. For example, while reviewing the contents of **Boyd's** email account, the investigative team identified a screenshot of an iMessage chat between **Boyd** and **Markwell**, in which **Markwell** sent **Boyd** his personal cell phone number (773-351-4004) because **Markwell** did not "want to communicate via my work phone and be inappropriate with regards to sharing information LOL."

56. The investigative team also identified a screenshot of an iMessage chat between **Boyd** and **Markwell**, in which **Markwell** asked **Boyd** to book a waterfront penthouse room for **Markwell** and "Brian" (*i.e.*, **Zukowski**) and to have Global Evento's office manager "add it," suggesting that **Markwell** wanted **Boyd** to have Global Evento invoice Norwegian Cruise Line for the cost of the booking.

57. The investigative team further identified a screenshot of an iMessage chat between **Boyd** and a contact saved as "JoAnna," believed to be **Dettmann**, which suggests that **Boyd** and **Dettmann** also communicated through text messages using iPhones.

58. Given that the **Targets** went on international trips together (some of the expenses

14

for which were invoiced by Global Evento to Norwegian Cruise Line), that **Boyd** and **Dettmann** were romantic partners, and that **Markwell**, **Zukowski**, and **Miloslavich** were romantic partners, the investigative team reasonably suspects that they communicated with each other via text messages.

59.     Because Apple ID accounts can store iMessages, among other information, such as screenshots of text messages (regardless of whether they were iMessages), the investigative team subpoenaed Apple for accounts associated with certain identifiers of the **Targets** (*e.g.*, name, date of birth, known phone numbers, known email addresses, known addresses, etc.).   Records produced by Apple in response to the subpoenas revealed the following information:

a.     Apple's records reflect that there are at least two Apple IDs associated with **Markwell**: **Subject Account #1** (tom_markwell@yahoo.com; DSID 401336549) and **Subject Account #2** (tmarkwell@nclcorp.com; DSID 16731219964).  The investigative team determined that **Subject Account #1** and **Subject Account #2** are associated with **Markwell** based on, among other things, the fact that **Markwell** used the Yahoo email address to communicate with **Dettmann** (which was learned through the review of records obtained from the federal search warrant for **Dettmann's** Global Evento email account) and the fact that the nclcorp email address was **Markwell's** work email address when he worked for Norwegian Cruise Line. Further, one of the phone numbers listed for both **Subject Account #1** and **Subject Account #2** is **Markwell's** known personal cell number (773-351-4004).  Apple's records further reflect that **Subject Account #1** and **Subject Account #2** use iCloud Features, including backing up

15

Messages in iCloud, Calendars, Notes, Contacts, and iCloud Photos.

b.     Apple's records reflect that an Apple ID associated with **Dettmann** is **Subject Account #3** (joanna@landedadventures.com; DSID 123194879). The investigative team determined that **Subject Account #3** is associated with **Dettmann** based on, among other things, the fact that the addresses listed for **Subject Account #3** is one of **Dettmann's** known address (455 Whittier Street, St. Louis, Missouri 63108). Apple's records further reflect that **Subject Account #3** uses iCloud Features, including backing up Messages in iCloud, Calendars, Notes, Contacts, and iCloud Photos.

c.     Apple's records reflect that an Apple ID associated with **Boyd** is **Subject Account #4** (boydnateboyd@gmail.com; DSID 10818899805). The investigative team determined that **Subject Account #4** is associated with **Boyd** based on, among other things, the fact that one of the addresses listed for **Subject Account #4** is one of **Boyd's** known addresses (315 East Carbonate Street, Hailey, Idaho 83333). Apple's records further reflect that **Subject Account #4** uses iCloud Features, including backing up Messages in iCloud, Calendars, Notes, Contacts, and iCloud Photos.

60.     Based on my training and experience, and the investigative team's investigation in this matter, I know that certain of the **Targets** often engaged in regular communication with each other. Those communications often took electronic form, and communications may exist in emails or text messages, which typically reside on smartphones. Communications between the **Targets** may be present in the **Subject Accounts**, either in the form of text messages or in the form of screenshot photographs, both of which can be backed up to an Apple ID account (such as the

16

**Subject Accounts**).

61.     While it is common for users to upgrade their smartphones and other electronic devices on a regular basis in the modern era, it is especially common for individuals attempting to conceal their criminal activities.  Due to this upgrade cycle, manufacturers of smartphones and other electronic devices have gone to great lengths to make the upgrade process easier for the user by automatically restoring old content to the new device. While this process varies from manufacturer to manufacturer, ultimately when a new device assumes the role and functionality of the previous device, the messages, photographs, applications, communication accounts, contact information, and other user data on the previous device is imported to the new device. This can happen even if the phone number or service provider is changed.  Based on my training and experience, I believe an examination of the **Subject Accounts** would reveal evidence of the outlined violations of federal law even if the devices associated with the **Subject Accounts** were newly purchased and not the specific devices utilized to conduct the criminal activity, particularly because of the complexities surrounding the deletion of data from cloud storage.

62.     In my training and experience, evidence of who was using an Apple ID (such as the **Subject Accounts**) and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records of Apple.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

63.     For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation.  Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in

furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

64.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date, and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

65.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

66.     Other information connected to an Apple ID may lead to the discovery of additional evidence.  For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.  In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators

18

and instrumentalities of the crimes under investigation.

67.     Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

68.     Based on the foregoing, there is probable cause to believe that information associated with the **Subject Accounts** that is contained in data stored at Apple is likely to constitute evidence, fruits, and instrumentalities of the crimes under investigation, including, but not limited to, GPS locations, photographs, and content of communications for the time period in Attachment B.

69.     Prior to seeking this warrant, I sent preservation requests to Apple requesting that Apple preserve records associated with the **Subject Accounts**.  Apple has since confirmed receipt of the preservation requests.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

70.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the United States copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, United States-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

71.     Based on the forgoing, I request that the Court issue the proposed search warrant.

The United States will execute this warrant by serving the warrant on Apple. Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

72.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

73.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

I state under the penalty of perjury that the foregoing is true and correct.

_____
CRAIG M. SCHNEIDER
Special Agent
Federal Bureau of Investigation


Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 on this _____12th_____ day of September, 2025.

_____
HON JOSEPH S. DUEKER
United States Magistrate Judge
Eastern District of Missouri

20

**ATTACHMENT A - 4:25 MJ 2302 JSD**

**Property to Be Searched**

This warrant applies to information associated with

**JOANNA@LANDEDADVENTURES.COM (DSID 123194879)** ("**Subject Account #3**") that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at 1 Apple Park Way, Cupertino, California 95014.

**ATTACHMENT B - 4:25 MJ 2302 JSD**

**Particular Things to be Seized**

I.     **Information to be disclosed by Apple Inc. ("Apple")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any emails, records, files, logs, or information that has/have been deleted but is/are still available to Apple, or has/have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the United States, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.     All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber

Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

      c.      The contents of all emails associated with the account from January 1, 2021 through the present, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

      d.      The contents of all instant messages associated with the account from January 1, 2021 through the present, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

      e.      The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

2

f.      All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.      All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h.      All records pertaining to the types of service used;

i.      All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

**Apple is hereby ordered to disclose the above information to the United States within 14 days of the date of this warrant.**

3

**II.      Information to be seized by the United States**

All information described above in Section I that constitutes contraband, fruits, evidence, and/or instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud), and involve Thomas Markwell, Joanna Dettmann a/k/a Joanna St. Gemme, Nathan Boyd, Brian Zukowski, Juan Acevedo Miloslavich, and others known and unknown (collectively, the "Targets"), from January 1, 2021 to the present, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a)      Evidence relating in any way to wire fraud;

(b)      Evidence relating in any way to any personal expenditures of any of the Targets that were paid for using any funds or credit cards of Global Evento and/or that were later invoiced by Global Evento to Norwegian Cruise Line;

(c)      Evidence relating in any way to any trip that any of the Targets took together for which Global Evento later invoiced Norwegian Cruise Line for any or all of the costs associated with the trip;

(d)      Evidence relating in any way to any travel that any of the Targets took together for which Global Evento later invoiced Norwegian Cruise Line for any or all of the costs associated with the travel;

(e)      Evidence relating in any way to the contents or amounts of invoices to be issued by Global Evento to Norwegian Cruise Line;

(f)      Evidence relating in any way to the expense codes and/or expense categories that should be used for any expenses incurred by Global Evento that were to subsequently be invoiced to Norwegian Cruise Line;

4

(g)     Evidence relating in any way to the contents, creation, or payment of invoices issued from Brian Zukowski d/b/a Zukowski Productions Services to Global Evento;

(h)     Evidence relating in any way to any work performed by Brian Zukowski or Brian Zukowski d/b/a Zukowski Productions Services for or on behalf of either Global Evento or Norwegian Cruise Line;

(i)     Evidence relating in any way to the contents, creation, or payment of invoices issued from GEM Consulting LLC to Norwegian Cruise Line;

(j)     Evidence relating in any way to any work performed by GEM Consulting LLC for or on behalf of Norwegian Cruise Line;

(k)     Evidence relating in any way to the contents, creation, or payment of invoices issued from Juan A. Acevedo Miloslavich Event Productions to Norwegian Cruise Line;

(l)     Evidence relating in any way to any work performed by Juan Acevedo Miloslavich or Juan A. Acevedo Miloslavich Event Productions for or on behalf of Norwegian Cruise Line;

(m)     Evidence relating in any way to marking up Global Evento invoices to reflect an amount that exceeded the costs and fees legitimately owed by Norwegian Cruise Line;

(n)     Evidence relating in any way to the transfer of funds between any of the Targets;

(o)     Records and information that refer or relate to communications between any of the Targets;

(p)     Records and information that refer or relate to financial transactions between any of the Targets;

(q)     Records and information concerning payments received by or sent from any of the Targets, or concerning debt owed by or to any of the Targets, relating to the violations described above, including any ledgers or documents recording such information;

5

(r)    Evidence relating in any way to any email accounts used in connection with any of the foregoing;

(s)    All records and communications, including any associated photos or videos, relating in any way to any of the foregoing;

(t)    Evidence indicating how and when the account or user ID was accessed or used to determine the geographic and chronological context of account or user ID access, use, and events relating to the crimes under investigation and to the account or user ID owner;

(u)    Evidence indicating the account owner's state of mind as it relates to the crimes under investigation;

(v)    All information or records relating in any way to associates, accomplices, and/or coconspirators;

(w)    The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s); and

(x)    The identity of the person(s) who communicated with the account or user ID relating to any of the matters described above, communications between parties in order to coordinate the crimes under investigation or other criminal activity, or other preparatory steps in furtherance of the scheme, including records that help reveal their whereabouts.